

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10601*

May 14, 2024

<u>BY ECF/EMAIL</u>
The Honorable Philip M. Halpern
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re:    ***United States v. Justice Jackson*, 22 Cr. 641 (PMH)**

Dear Judge Halpern:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Justice Jackson, scheduled for May 28, 2024. As described below, the defendant was an active member of the violent street gang called the Double Nine Grim Reapers (the "Grimz") that terrorized local communities and demonstrated a complete disregard for human life. As a member of the Grimz, the defendant participated in multiple acts of violence, including an attempted murder, which resulted in injuries to three victims on separate occasions.

For reasons further discussed below, the Government respectfully submits that a sentence of at least 240 months' imprisonment would be sufficient, but not greater than necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, to protect the public from the defendant's clear danger to the community, and to ensure adequate general and specific deterrence. Probation calculates an overall Guidelines range of 355 to 413 months' imprisonment (which includes a 120-month mandatory minimum sentence) and recommends a total sentence of 240 months' imprisonment. PSR at 35.

A.    **The Offense Conduct**

*Background – The Grimz*

As Your Honor is aware, the Grimz is a violent street gang that was founded by Justice Jackson's co-defendants: Jeremy Williams and Randy Jones. The Grimz has hundreds of members across New York State and the surrounding area, including in Newburgh, Manhattan, Brooklyn, the Bronx, Pennsylvania, and New Jersey. Jackson and his co-defendants primarily operated in and around the City of Newburgh, New York. PSR ¶ 74.

The Grimz is comprised of different sets (or "Grips," as gang members call them), with each Grip having its own leadership hierarchy. Members of each Grip report up to their respective

leaders, many of whom are listed on the Grimz main leadership lineup, known as the Cloud9. The Grimz, like most other Bloods street gangs, has two separate hierarchical rank structures: a "Prison Lineup" for Grimz members in the prison system and a "Street Lineup" for Grimz members who are not incarcerated.  PSR ¶ 75.

In addition, members of the Grimz are expected to follow an internal set of laws known as the Grimz laws. The screenshot below (also reproduced as text for reference), which was recovered from a Grimz member, contains an example of the laws that the Grimz are expected to follow:



GRIM LAW

1. All Reapers must present their reaper number upon meeting a new reaper. If you do not have a reaper number than you will not be recognized as a reaper.

2. All triple 9 on the mainline must be taken care of as soon as possible.

3. Reapers will ride for one another despite their differences.

4. Never leave a reaper/Teflon alone in a potentially dangerous area

5. All reapers must be able to properly protect & defend themselves always. (Reapers locked down must have light weight) is a priority.

According to gang literature found on recovered phones and iClouds from Grimz members, "light weight" is Grimz code for a gun for a member on the street and a razor for a member who is in prison:



In other words, the internal laws of the Grimz required all members to be armed with a gun or a razor. The defendant, like most other members of the Grimz, appears to have abided by these internal laws, including the requirement that he be armed with a gun.

Among other things, the Grimz engaged in acts involving murder, assault, robbery, wire fraud, bank fraud, and narcotics trafficking. PSR ¶¶ 74, 76. Specifically, certain Grimz members/ associates sold crack cocaine, Oxycodone, heroin, synthetic cannabinoid (commonly known as "K2"), and marihuana and possessed firearms in furtherance of their drug trafficking. PSR ¶ 76. Additionally, the Grimz's drug trafficking involved the distribution of K2 in New York State prisons by other Grimz members/associates. PSR ¶81. Finally, Grimz members and associates, including the defendant, committed numerous acts of violence, including assaults, armed robberies, and attempted murders to protect and expand their narcotics business, protect fellow Grimz members/associates, and to otherwise promote the standing and reputation of the Grimz. PSR ¶ 77.

While many of the gang's activities targeted rival gang members, the gang's actions had devastating impacts on the surrounding communities. Grimz members regularly carried guns, prepared to engage in shootouts or commit robberies, and when they engaged in shootings, they often did so in public where innocent stood vulnerable to harm without notice. Accordingly, as demonstrated below in descriptions of the defendant's conduct, the gang forced entire communities to live under a constant threat that violence could erupt at any moment as they went about their daily lives.

*The November 3, 2020 Attempted Murder*

The Grimz frequently retaliated against members of rival gangs. On the night in question, the defendant and other Grimz members/associates were gathered in the area of Liberty Street and Clinton Street in Newburgh when they learned about the location of a rival gang member ("Victim-1") on Roe Street. The defendant and others, who were all armed with guns, then split into two groups and converged on Roe Street. The defendant's group circled the area where Victim-1 was last seen before making their way on foot toward Victim-1. Before the defendant's group could get to Victim-1, they saw the police and fled because another Grimz member/associate (who is a co-defendant) had beat the defendant to shooting Victim-1. As a result, Victim-1 suffered life-threatening injuries and had to be taken via helicopter to a secondary hospital where he underwent surgery and survived. PSR ¶¶ 78, 84, 93.

*The November 10, 2020 Armed Robbery*

The Grimz frequently attacked rival drug dealers to protect or expand their narcotics business. On November 10, 2020, the defendant and other Grimz members/associates planned to rob a marihuana dealer ("Victim-2") who they located on social media. The defendant and other Grimz members/associates (who were all armed with guns) then made their way to an apartment complex on Lake Street in Newburgh where they believed Victim-2 was located. After failing to locate Victim-2 during their first trip to the apartment complex, the defendant and other Grimz members/associates then returned and approached Victim-2, who was standing in a group. Someone from the defendant's group then pulled out a firearm and began shooting. The

defendant's group ultimately stole a quantity of marihuana and left Victim-2 with a gunshot wound to the leg. PSR ¶¶ 79, 84, 89.

*The October 31, 2021 Armed Robbery*

On October 31, 2021, the defendant and other Grimz members/associates robbed a rival drug dealer ("Victim-3") at Victim-3's residence in the vicinity of South Clark Street in Newburgh. Again, the defendant and other Grimz members/associates initially could not find Victim-3 when they went to the vicinity of Victim-3's residence. Undeterred, the defendant and the other Grimz members/associates returned to Victim-3's residence, disarmed Victim-3 of a revolver, pistol-whipped Victim-3 with that revolver, stabbed Victim-3 in the leg, and stole Victim-3's money, marihuana, and revolver.  PSR ¶¶ 80, 84, 89.

*The December 18, 2021 Armed Robbery*

On December 18, 2021, the defendant and other Grimz members/associates went to a house on Liberty Street in Newburgh. The defendant's group believed that the house belonged to a drug dealer, who they planned to rob. However, the house was occupied by four innocent individuals, including a pregnant woman and an infant child. The defendant's group, who were armed with multiple firearms, forced their way into the victims' apartment and stole the victims' jewelry a wallet, and a jacket. In the process, one of the victims was thrown to the ground and had multiple firearms pointed at him and another victim had jewelry ripped from her wrist.  PSR ¶ 82.

## B.    The Plea Agreement and the Applicable Guidelines Range

The plea agreement between the Government and the defendant sets forth the parties' understanding of the appropriate offense level under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines").  The Guidelines calculation for Count One is based on the following predicate activities: (1) the attempted murder of a rival gang member on or about November 3, 2020; (2) the robbery of a marihuana dealer on or about November 10, 2020; (3) the robbery of a drug dealer on or about October 31, 2021; and (4) narcotics trafficking.  PSR ¶ 24.  Based on these predicate activities, the plea agreement calculated a total offense level of 37 for Count One.[1] PSR ¶ 56.

The plea agreement calculated 3 criminal history points based on the following:

---

[1]    The Government acknowledges the sentencing disparities between crack and powder cocaine and the Eliminating a Quantifiably Unjust Application of the Law Act ("EQUAL Act of 2021"). This proposed legislation would eliminate the powder-to-cocaine base sentencing disparity in 21 U.S.C. §§ 841 and 960. Although the Department supports elimination of the powder-to-cocaine base disparity, until legislation to that effect is passed, the current statutory and guidelines provisions remain in effect.  In this case, the amount of cocaine base attributable to the defendant is approximately 500 grams, which results in a current base offense level of 32, resulting (after the applicable enhancements and using Criminal History Category II) in the current overall Guidelines Range of 355 to 413 months' imprisonment. However, if the powder cocaine Guidelines were instead applied to the same amount of cocaine base, the base offense level would be 30, but there would be no change to the overall Guidelines range.

1. On or about December 2, 2015, the defendant was convicted of burglary in the third degree and adjudicated a juvenile delinquent for which he was sentenced to a conditional discharge.

2. On or about August 10, 2021, the defendant was convicted of criminal mischief in the fourth degree and adjudicated a juvenile delinquent for which he was sentenced to a conditional discharge.

3. On or about August 31, 2022, the defendant pled guilty in Orange County Court to attempted criminal possession of a weapon in the second degree, in violation of New York Penal Law Section 265.03(3). The defendant has not yet been sentenced.

Based on the above, the plea agreement placed the defendant in Criminal History Category II. PSR ¶ 61. The plea agreement between the defendant and the Government stipulated that the defendant's Guidelines range is 235 to 293 months' imprisonment for Count One plus a mandatory minimum term of imprisonment of 120 months for Count Three, which must be consecutive to any other sentence imposed, resulting in a total offense level of 355 to 413 months' imprisonment. PSR ¶¶ 14, 21- 62.

The United States Probation Office (the "Probation Office") calculated the same Guidelines range. PSR ¶¶ 91-144, 176-77. However, for Count One, the Probation Office included an additional predicate act—namely, the December 18, 2021 robbery that was charged in *United States v. Justice Jackson*, 22 Cr. 47 (KMK). PSR ¶ 92. This additional predicate act did not change the offense level or the Guidelines range because it was not assessed any units in the multiple counts adjustment analysis. PSR ¶ 178.

The Probation Office recommends a sentence of 120 months' imprisonment on Count One, 120 months' imprisonment on Count Three (which must be consecutive to any sentence on Count One), and 5 years of supervised release. PSR at 35. In support of its recommendation, the Probation Office considered several mitigating factors, including the defendant's early plea allocution, the fact that the instant case is the defendant's first period of incarceration, the defendant's age at the time of the instant offense, and the defendant's rough upbringing. PSR at 36-37. Nevertheless, the Probation Office recommended a total sentence of 240 months' imprisonment because of the seriousness of the offense (which left multiple victims injured on separate occasions), the need for deterrence, the need to promote respect for the law, and the need for rehabilitation. PSR at 37.

For his part, the defendant seeks a sentence of 140 months' imprisonment: 20 months' imprisonment on Count One and 120 months' imprisonment on Count Three. Def. Mem. at 1. In making this request, the defendant notes a number of mitigating factors, including: his childhood being marked by poverty, neglect, and domestic violence; the loss of his father's guidance; his age at the time of the instant offense; his positive post-arrest conduct; his acceptance of responsibility; and the support of his friends and family. *See* Def. Mem. at 1-5, 8-10.

### C.    Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."  *Gall v. United States*, 552 U.S. 38, 46 (2007).  It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing).  Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7).  See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant;

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### D.    A Sentence of at Least 240 Months' Imprisonment Is Appropriate in This Case

The Government respectfully submits that a sentence of at least 240 months' imprisonment is sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.  As further discussed below, the Government submits that a sentence of at least 240 months' imprisonment is necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, and to protect the public and ensure adequate deterrence.

*First*, a sentence of at least 240 months' imprisonment is necessary to reflect the nature and circumstances of the offense, and the need to reflect the seriousness of the offense, promote

respect for the law, and provide just punishment. To say that the defendant's offense conduct is serious, is a complete understatement. The defendant was not just a member of an incredibly violent gang, he was an active participant. As set forth below, the defendant participated in an attempted murder and three armed robberies with other Grimz members/associates over the course of approximately 13 months. Moreover, these were not simply crimes of opportunity. Rather, these were violent attacks that were planned out by the defendant and other Grimz members/associates. For example, during the November 3 attempted murder, the defendant and the Grimz members/associates split up into two groups as they drove toward Victim-1 and then the defendant's group circled the area before deciding to proceed toward Victim-1 on foot. As another example, during the November 10 armed robbery, the defendant and other Grimz members/associates initially failed to locate Victim-2. However, the group was undeterred and eventually returned to look for Victim-2 after regrouping in the area of Liberty Street and Clinton Street in Newburgh—*i.e.*, where Grimz members/associates frequently congregated.

The defendant was not alone in committing these senseless acts of violence. Around this time, other Grimz members/associates in Newburgh—likely emboldened by the defendant's actions—also participated in other acts of violence involving guns. The defendant's actions—and the Grimz reign of terror in Newburgh—left individual victims with serious physical injuries (including life-threatening injuries in the case of Victim-1) and caused irreparable harm to a community who was forced to live in fear that they, too, may become a victim of the Grimz's violence. Thankfully, the defendant's actions did not result in anyone being killed. But the fact that no one was killed during any of these incidents does not detract from the seriousness of the offenses. Moreover, the defendant knows more than most the devastating effects of growing up in a "crime-ridden environment" and being exposed to "frequent, severe[ ] violence," having lost his father at a young age and having grown up in a "terrible neighborhood" characterized by "frequent shootings" between multiple gangs. Def. Mem. 2-4. Nevertheless, the defendant heavily contributed to the "crime-ridden neighborhood" plagued by senseless acts of violence that the defendant points to as a mitigating factor. Def. Mem. at 4.

The defendant also participated in the gang's other illegal activities, including trafficking drugs on the streets and in the New York State prison system. As Your Honor is aware, the flood of dangerous and addictive drugs like crack cocaine is an incredibly serious offense that has devastating impacts on our communities.

A sentence of at least 240 months' imprisonment is also appropriate to promote respect for the law and to provide just punishment for the offense. The Grimz gang developed and operated according to its own code of conduct, which demonstrated no regard for the law. The gang's core principles were in direct contravention of numerous laws and its members all considered themselves above the law. As a dedicated member of the Grimz, the defendant demonstrated a complete disregard for the law, day after day for years. The defendant demonstrated time and time again that he has no respect for the law, both from his criminal history, which is further described below, as well as his participation in the Grimz gang. Finally, a sentence of at least 240 months' imprisonment is required to provide just punishment for the offense given that the offense here involved injuries to multiple individuals as well as the community.

*Second*, a sentence of at least 240 months' imprisonment is also appropriate given the defendant's history and characteristics and the need to promote respect for the law. With respect to the defendant's history and characteristics, the Government acknowledges that the defendant had an incredibly difficult childhood, with little to no stability in his upbringing. The Government further recognizes that this lack of stability may well have been a motivating factor for why the defendant became involved with the Grimz. And of course, the defendant's background is a factor for the Court's consideration. However, as described in detail above, the defendant was not just a member of the Grimz, he was active member of the gang that participated in all aspects of the gang's activities, including the most serious of offenses – the attempted murder of a rival gang member and several armed robberies. The defendant has a limited employment history, working just a couple of weeks in 2020 or 2021. Instead, the defendant appears to have made his money and spent his time dealing drugs and participating in robberies with the Grimz. As further described above, the defendant does not have a lengthy criminal history. However, the defendant—at just twenty-one years old—already has three criminal history points and is awaiting sentencing on his most serious conviction prior to the instant offense. Ultimately, the Government respectfully submits that considerations related to the defendant's upbringing and childhood do not support imposing a sentence of below 240 months' imprisonment. Rather, such considerations are already incorporated into the fact that the Government is asking for a sentence of at least 240 months' imprisonment – well below the overall Guidelines range of 355 to 413 months' imprisonment.

*Finally*, a sentence of at least 240 months' imprisonment is also appropriate to ensure general deterrence. Unfortunately, the Grimz is just one of many violent gangs that operate in and around New York and recruit young members by glamorizing violence and drug trafficking and the money made off these illegal activities. Indeed, while law enforcement's investigation in this matter led to the arrest of numerous members of the Grimz, including high-level leaders, the gang continues to operate, both outside in our communities and within prisons. Gangs like the Grimz live and thrive off a code that requires members to engage in senseless acts of violence to "send a message" to rival gang members. This then leads to a never-ending cycle of retaliatory violence wherein people are killed and generations of people are forced to live amongst a constant threat of violence breaking out at their doorstep. A sentence of at least 240 months' imprisonment is therefore necessary to send the appropriate message from the criminal justice system that individuals who become active and contributing members of these violent organizations will face a serious sentence of imprisonment for their acts of violence, particularly those acts that result in life threatening injuries or harm to innocent bystanders. Moreover, nearly taking another person's life is an incredibly serious action, requiring a serious sentence of imprisonment to properly ensure general deterrence.

Furthermore, a sentence of 240 months' imprisonment is further necessary to ensure specific deterrence and protect the public from further crimes of the defendant. This is the defendant's fourth conviction, which is significant given that the defendant was only 19 years old when he was arrested. Further troubling is the fact that not only does the defendant have a relatively long criminal history given his age, but the fact that he committed two of the armed robberies while his felony case for Attempted Criminal Possession of a Weapon in the Second Degree was pending—demonstrating his deep lack of respect for the law.

**E.    Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of not less than 240 months' imprisonment.

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney

by: __/s_____
Jennifer N. Ong
Ryan W. Allison
Margaret N. Vasu
Assistant United States Attorneys
(212) 637-2224/-2474/(914) 993-1926